IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SHONTA MICHAEL, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **Case No. 3:05-cv-0177** |
| ) | **Judge Trauger** |
| CATERPILLAR FINANCIAL SERVICES ) | |
| CORPORATION, ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by the defendant, Caterpillar Financial Services Corporation (Docket No. 19), to which plaintiff Shonta Michael has responded (Docket No. 27), and the defendant has replied (Docket No. 29). For the reasons discussed herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND and PROCEDURAL HISTORY

Shonta Michael, the African-American plaintiff in this case, is currently employed as an Engineering Staff Accountant at the Griffin, Georgia facility of the defendant, Caterpillar Financial Services Corporation.[1] Prior to her transfer to this facility, the plaintiff worked initially as a Business and Asset Manager and, later, a Financial Analyst in the Information Technology ("IT") Department at the defendant's Nashville, Tennessee, facility. (*See* Docket No. 21 at 9.) Before

---

[1] Unless otherwise noted, all facts have been drawn from the plaintiff's Amended Complaint (Docket No. 13), her Memorandum in Opposition to the Defendant's Motion for Summary Judgment (Docket No. 27), and her Disputed Issues of Material Fact (Docket No. 28).

1

starting at the Nashville facility in September 2003, she held a variety of accounting-related positions at the defendant's Peoria, Illinois facility, where she began working in August 1997. All of the events giving rise to the plaintiff's claims took place at the defendant's Nashville facility, where she served as the "first black accounting manager in [the] company." (*See* Docket No. 13 ¶ 10.)

The plaintiff's job at the Nashville facility required her to supervise two of the defendant's employees, James Gooden (Caucasian) and Pam McGhee (African-American), as well as two contract employees. In turn, the plaintiff reported first to Holly Tomlinson (Caucasian) and then, following Tomlinson's transfer, to Patricia Henry (Caucasian). Diane Rezaii (Caucasian) served as Henry's direct supervisor.

The plaintiff's tenure under Tomlinson was characterized by an unblemished performance record. On January 8, 2004, the plaintiff received a very favorable performance evaluation, which noted that, among other things, she "ha[d] an excellent relationship with her staff," as well as "perfect attendance at weekly and monthly management meetings." (*See* Docket No. 13 ¶ 17.) This review was accompanied by an "Eye on Quality Award," which was given to the plaintiff by Rezaii and Tomlinson in return for the plaintiff's "care for others," "responsibility," and "exceeding expectations." (*See* Docket No. 13, Ex. B.) While the defendant claims that Tomlinson, while discussing the plaintiff's performance evaluation with her, noted that the plaintiff "needed to do a better job of attending meetings on time," the plaintiff refutes this assertion. (*See* Docket No. 28 ¶ 31.)

The plaintiff bases her Amended Complaint on events that took place beginning on Thursday, January 15, 2004, the day that Henry officially replaced Tomlinson. The plaintiff, who was facing a year-end-report deadline of Friday, January 16, claims that she worked from home

2

that Thursday evening and the following Friday during the day in order to complete the reports on time, which she did successfully.  She asserts that she had implied authorization from Tomlinson to work from home but admits that she neither received explicit permission from Tomlinson nor told Henry that she would be away from the office.  (*See* Docket No. 22, Ex. 3, Michael Dep. at 85-86.)

The following Tuesday, January 20, Michael arrived late for a previously scheduled meeting in Henry's office. The plaintiff asserts that she was "approximately five minutes late" due to the fact that her previous meeting ran over, while the defendant claims that she was "at least fifteen minutes" tardy.  (*See* Docket No. 29 ¶ 33, Docket No. 28 ¶ 56.)  The plaintiff describes her meeting with Henry as peppered with Henry's "loud and angry outbursts," as well as her threatening accusations that the plaintiff's work was unsatisfactory.  (*See* Docket No. 28 ¶ 35.) Following the meeting, the plaintiff filed with the "all-white" Human Resources Department ("Human Resources") a complaint outlining Henry's "discourteous and undignified manner."  (*See id.* ¶ 39; Docket No. 13 ¶ 40.)  Henry also immediately reported to Human Resources the plaintiff's alleged raised voice and refusal to answer questions during the meeting.

During this same time period, Gooden, one of the employees under the plaintiff's supervision, had complained to Rezaii that "he felt degraded by [the plaintiff] and very uncomfortable working with her."  (*See* Docket No. 28 ¶ 42.)  Specifically, Gooden alleged that the plaintiff "made him perform personal tasks such as fetching water for [her] . . ., retrieving her papers and faxes from the printer, and picking up her lunch from Captain D's restaurant." (*See id.*; *see also* Docket No. 22, Ex. 8, Gooden Dep. at 64.)  The plaintiff denies these allegations.  Rezaii and Henry relayed Gooden's complaints to Senior Human Resources Specialist Jackie Sweeney, who later interviewed each of the plaintiff's supervisees and, according to the defendant, received from many of them unfavorable reports about her workplace behavior.

3

On January 21, the plaintiff contacted Rezaii about Henry's behavior at their January 20 meeting. Rather than discussing Henry's behavior, however, Rezaii allegedly told the plaintiff that she was "under investigation" based on Gooden's allegations. (*See* Docket No. 13 ¶ 9.) It is undisputed, however, that Rezaii also told the plaintiff that she would report Henry's behavior to Human Resources. The following day, the plaintiff attended a meeting with Rezaii and Sweeney, during which they discussed the plaintiff's alleged performance problems, including her tardiness, her failure to meet deadlines, and her failure to follow instructions. At this meeting, Rezaii and Sweeney purportedly informed the plaintiff that, due to these problems, she could either accept a demotion or be terminated altogether.[2] At the conclusion of this meeting, Rezaii asked that the plaintiff turn in her company-issued laptop, take the following day off, and report back to work on Monday, January 26. The plaintiff alleges that, on Friday, January 23, Rezaii offered the plaintiff's position to Michelle Wilson, a Caucasian woman.

When the plaintiff arrived at work that Monday, however, she was offered two new options: 1) remain in her current position and be placed on a 90-day performance plan, as required under the defendant's written policy for under-performing employees (*see* Docket No. 27, Ex. 13 at 1 (describing "Step 1" of Policy Number 701)) ; or 2) accept a lateral transfer to a position under a different supervisor. Although she disputed the need for such action, the plaintiff chose the former option and successfully completed the performance plan, which specified seven areas of required

---

[2] According to Policy Number 701, the defendant's written policy regarding "less than satisfactory performance issues," an aggrieved manager faced with an under-performing employee first is to meet collaboratively with the employee in order to "mutually agree . . . what actions will be taken to achieve satisfactory performance." (*See* Docket No. 27, Ex. 13 at 1 (describing "Step 1" of the plan).) The manager should then request the employee's signature as an acknowledgment of their discussion. Under "Step 2" of the plan, if the employee's performance has not improved following the parties' initial meeting, specific punitive actions can then be discussed. (*See id.* at 1-2.)

4

improvement and required the plaintiff to meet with Henry on a regular basis. The plaintiff alleges that, during this probationary period, "Henry would constantly demean and embarrass [her] in the presence of [the plaintiff's] staff by openly criticizing her abilities in a disparaging manner." (*See* Docket No. 13 ¶ 65.) The plaintiff admits that she retained her job title and responsibilities during this period and acknowledges that she received a merit increase in April 2004. The probationary period concluded on April 29, 2004.

In June 2004, as a result of a reorganization of the IT Department, the plaintiff was transferred to a non-supervisory Financial Analyst position. The plaintiff retained the same salary grade, compensation, incentive compensation, and chain-of-command in her new position as she had in her old one. Following her reassignment, the plaintiff filed another complaint with Human Resources.

Also in June 2004, Henry contacted the plaintiff about an accounting position in Griffin, Georgia that had become open. The plaintiff admits that she was "surprised" and "happy" to learn of this new position, as her nine-year relationship with a man in the Nashville area had recently come to an end. (*See* Docket No. 28 ¶¶ 113-14.) The plaintiff began training for her new position in July 2004 and officially began work as an Engineering Staff Accountant in Griffin soon afterward. The plaintiff's new position afforded her a three-percent increase in salary, as well as "significant incentive compensation." (*See id.* ¶ 118.) In April 2005, the plaintiff was promoted. She now earns significantly more money than she did while working in Nashville.

The plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") on January 23, 2004, alleging that the defendant had discriminated against her based on her race. In September 2004, the EEOC mailed to the plaintiff a Notice of Determination, which stated that "based on information discovered during [its] investigation [of the defendant], there is evidence

that a racially hostile work environment exists for Black employees. Evidence shows that [the plaintiff] was treated less favorably than other managers with allegations of subordinate complaints against them." (*See* Docket No. 27, Ex. 14 at 1.) Following the EEOC's failed attempts to achieve conciliation between the plaintiff and the defendant, it mailed to the plaintiff on December 10, 2004, her Notice of Right to Sue. (*See* Docket No. 13, Ex. A.) The plaintiff filed suit in this court on March 7, 2005. (*See* Docket No. 1.)

## ANALYSIS

The plaintiff charges the defendant with racial discrimination, retaliation, and the creation of a hostile work environment. (*See* Docket No. 13 at 15-17.) The defendant has moved for summary judgement on each of the plaintiff's claims, which she brings pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (2000), § 1981 of the Civil Rights Act of 1991, 42 U.S.C. § 1981, and the Tennessee Human Rights Act ("THRA"), Tenn. Code. Ann. § 4-21-101, *et seq.* (2005).

### I.  Relevant Standards

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

6

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

Although the plaintiff asserts her claims under three different statutes, both § 1981 and the THRA track traditional Title VII burden-shifting analysis. *See Newman v. Fed. Express Corp.*, 266

F.3d 401, 406 (6th Cir. 2001); *Wade v. Knoxville Utilities Bd.*, 259 F.3d 454, 464 (6th Cir. 2001); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996). Accordingly, the following Title VII analysis applies to each of the plaintiff's causes of action.

**II.     The defendant is entitled to judgment as a matter of law on the plaintiff's claims of racial discrimination and retaliation.**

In analyzing the plaintiff's allegations of discrimination and retaliation,[3] the court must employ the *McDonnell Douglas* approach, which first requires a plaintiff to establish a *prima facie* case for each of her claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (retaliation); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002) (citing *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246–47 (6th Cir. 1995)) (discrimination).

Once a plaintiff makes out a *prima facie* case on either claim, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action, after which the plaintiff must demonstrate that the proffered reason was a mere pretext for what was actually an improper motive. *See Abbott*, 348 F.3d at 542; *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997).

To establish a *prima facie* case of race discrimination under Title VII, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she suffered an adverse action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated differently from similarly situated non-protected employees. *Warfield v. Lebanon*

---

[3]The defendant claims that § 1981 does not allow for retaliation-based causes of action. (*See* Docket No. 21 at 13 n.6.) The Sixth Circuit, however, has explicitly recognized such claims as viable. *See Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001).

*Corr. Inst.*, 181 F.3d 723, 729 (6th Cir. 1999). In order to establish a *prima facie* case of retaliation under this same framework, a plaintiff must demonstrate the following: (1) she engaged in activity protected by Title VII; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an employment action adverse to her; and (4) a causal connection existed between the protected activity and the adverse employment action. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997). The burden of establishing a *prima facie* case in a retaliation action is not onerous, but easily met. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Even given her relatively light burden at the *prima facie* level, the plaintiff has failed to demonstrate that she suffered any adverse action at the hands of the defendant. In order to establish that she was subjected to an adverse employment action, a plaintiff must show "termination of employment, a demotion evidenced by a decrease in salary or wage, a less distinguished title, a material loss of benefits, or other indices that might be unique to a particular situation." *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1996) (citing *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993)). Thus far, the Sixth Circuit has not specified what such "indices" might include. *Richmond-Hopes v. City of Cleveland*, No. 97-3595, 1998 WL 808222, at *8 (6th Cir. Nov. 16, 1998) (unpublished). It has indicated, however, that "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Hollins*, 188 F.3d at 662. Additionally, it recently noted that a mere "bruised ego" is not enough to constitute an adverse employment action. *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004).

The plaintiff principally argues that the defendant took an adverse action against her

9

when it subjected her to race-based harassment that amounted to a hostile work environment. Because, as explained below, *see infra* Part III, no genuine issue of material fact exists as to whether the plaintiff was subjected to race-based harassment, any discussion of whether such harassment may qualify as an adverse action for the purposes of *prima facie* discrimination and retaliation analysis would be inapposite.

Because the plaintiff refers to a number of the defendant's actions that arguably could be considered adverse, this court will explain briefly why none of them qualifies as such. First, the defendant complains that she was placed on a 90-day performance plan based on her employee, James Gooden's, complaints about her, while her supervisor, Patricia Henry, met no consequences despite the plaintiff's complaints about her. An employer's requirement that an employee comply with a performance plan does not qualify as an adverse action. *See Miceli v. U.S. Dep't of Transp.*, 83 Fed. App'x 697, 700 (6th Cir. 2003); *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002). Accordingly, even if the imposition of the performance plan was unfair, as the plaintiff alleges it was, the plaintiff was not subjected to an adverse employment action that Henry avoided.[4]

Next, the plaintiff appears to allege that her transfer within the Nashville facility from the Business and Asset Manager position to a Financial Analyst position qualifies as an adverse action. Because the plaintiff retained the same salary grade, compensation, incentive compensation, and chain-of-command in her new position as she had in her old one, this lateral transfer does not

---

[4]In addition, it is not the court's place to second-guess the defendant's business practices in not investigating Henry, absent some proof, which is not evident here, that this failure to investigate her was illegal. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (finding that "it is inappropriate for the judiciary to substitute its judgment for that of management"); *see also White v. Columbus Metro Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) (finding that "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext").

qualify as an adverse action. *See Hollins*, 188 F.3d at 662; *Kocsis v. Multicare Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996). While she did lose supervisory authority over two employees, the plaintiff has not demonstrated that this qualifies as anything other than a mere alteration of job responsibilities. *See id.*; *see also Bialczak v. Ohio Dep't of Taxation*, No. 99-3841, 2000 WL 1888789, at *2 (6th Cir. 2000) (unpublished) (finding that an employer's reduction of an employee's supervisory authority as part of an internal reorganization did not qualify as an adverse action).

Finally, the plaintiff claims that she was transferred to the defendant's Griffin, Georgia facility in retaliation for her complaints of race discrimination. The plaintiff admits, however, that she was "surprised" and "happy" to learn of this new position, as her nine-year relationship with a man in the Nashville area had recently come to an end. (*See* Docket No. 28 ¶¶ 113-14.) She also acknowledges that her transfer to the Griffin facility was voluntary. (*See id.* ¶ 117.) Voluntary, lateral transfers do not qualify as adverse actions. *See Hollins*, 188 F.3d at 662; *Kocsis*, 97 F.3d at 885.

Accordingly, because the plaintiff has not demonstrated that she suffered any adverse action at the hands of the defendant, she has failed to meet her burden of establishing a *prima facie* case of racial discrimination or retaliation. As such, the defendant is entitled to judgment as a matter of law on both claims.

### III.  No genuine issue of material fact exists as to whether the defendant subjected the plaintiff to a hostile work environment.

A hostile working environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the

11

conditions of the victim's employment and create an abusive working environment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  In order to make out such a claim, a plaintiff must demonstrate the following: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment created a hostile working environment; and (5) her employer has *respondeat superior* liability.  *See Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999); *Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999).  Where an employee claims harassment by a superior, as does the plaintiff in this case, she may demonstrate the *respondeat superior* prong of her claim by showing that her employer failed to take reasonable care to prevent and correct any harassing behavior, thus rendering it liable for the harassment she experienced.  *Hafford v. Seidner*, 183 F.3d 506, 512-13 (6th Cir. 1999).

Here, the plaintiff alleges that the actions of some of the defendant's employees were of such a harassing nature that they constituted a hostile work environment.  Specifically, she alleges that Diane Rezaii and Jackie Sweeney unfairly sent her home, took away her laptop computer, and threatened to terminate her following complaints made against her by James Gooden.  In addition, she claims that her managers harassed her by baselessly placing her on the 90-day performance plan, which required her to meet with Patricia Henry, her direct supervisor, on a regular basis.  She also asserts that Henry "[went] behind [her] back and question[ed] [her] subordinate employees about what [she] was or was not doing, thereby undermining [her] management authority." (*See* Docket No. 27 at 16.)  Finally, she claims that the management's failure to investigate complaints that she lodged against Henry contributed to the formation of a hostile work environment.  In response to this last allegation, the defendant asserts that Rezaii told the plaintiff that the plaintiff's

12

complaint would be investigated, but the plaintiff argues that "no one from Human Resources ever followed up with [her] regarding her complaints of discrimination against . . . Henry." (*See* Docket No. 28 ¶ 73.)

Most of the actions of which the plaintiff has complained involve steps taken against her following Gooden's complaints about her supervisory abilities. The plaintiff has not demonstrated that such steps were taken for any reason other than because one of her employees lodged a complaint against her, which was then substantiated by further investigation. (*See id.* ("Rezaii . . . explained that she received complaints about [the plaintiff's] management style and that the HR department was investigating those complaints. . . Undisputed.").) No evidence has been cited to demonstrate that the plaintiff's managers were instead acting in furtherance of some sort of discriminatory motive. If any of the actions listed by the plaintiff do qualify as race-based, however, it is only the latter one, in which the defendant arguably neglected to investigate the plaintiff's complaints about Henry, her Caucasian supervisor.

In order to demonstrate that she was subjected to a hostile working environment, a plaintiff must meet both an objective and a subjective test. She must show that the conduct about which she is complaining was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and that, in addition, she subjectively regarded that environment as abusive. *Bowman*, 220 F.3d at 463 (citing *Harris*, 510 U.S. at 21-22).

A court tasked with deciding if a working environment is objectively hostile or abusive must evaluate the totality of the circumstances presented to it. *Williams*, 187 F.3d at 562. "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether–taken together–the reported incidents make out such a case." *Id.* In making such a determination, a court may consider a number of factors,

13

including but not limited to the following: "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. The Supreme Court has noted that, in conducting this analysis, "no single factor is required" in order to determine that an employee's working environment was objectively hostile or abusive. *Id.*

The Supreme Court has cautioned courts against overreaching the bounds of Title VII's prohibitions and allowing it to become a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). It has emphasized that "properly applied, [Title VII standards] will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing." *Id.* (internal citations omitted); *see also Hafford*, 183 F.3d at 512-13 ("'A recurring point' in the Supreme Court opinions is that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" (quoting *Faragher*, 524 U.S. at 788)).

Even if the failure of the defendant to investigate the plaintiff's complaints against Henry was race-based, it does not demonstrate that the plaintiff was subjected to an objectively hostile work environment. Simply put, no genuine issue of material fact exists as to whether this alleged, one-time failure was so severe that it altered the terms and conditions of the plaintiff's employment. *See Bowman*, 220 F.3d at 463. In addition, the defendant's purported neglect to investigate Henry does not appear to have interfered with the plaintiff's performance at work, as she successfully completed the 90-day performance plan and even received a merit-based raise during that time. Accordingly, because the plaintiff has not presented evidence that would allow a

14

reasonable jury to find that the defendant subjected her to an objectively hostile work environment, her assertions to this end must fail.

## CONCLUSION

The plaintiff has not demonstrated that a genuine issue of material fact exists as to whether the defendant subjected her to an adverse action for the purposes of her racial discrimination or retaliation claims. In addition, she has failed to offer evidence that would allow a reasonable jury to conclude that she has been subjected to a hostile working environment based on racial harassment. Thus, the defendant's motion for summary judgment on all claims will be granted, and this case will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge